**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------

MELISSA STRAWBRIDGE,

                              Petitioner,

           v.                                    No. 04-CV-268
                                                  (GTS/DRH)

ELAINE LORD, Superintendent,
                              Respondent.
-------------------------------------------------------------

**APPEARANCES:**                    **OF COUNSEL:**

HARRINGTON & MAHONEY           MARK J. MAHONEY, ESQ.
Attorney for Petitioner
70 Niagara Street
Third Floor
Buffalo, New York 14202-3093

HON. ERIC T. SCHNEIDERMAN      ALYSON J. GILL, ESQ.
Attorney General for the State    Assistant Attorney General
      of New York
120 Broadway
New York, New York 10271

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[1]

    Petitioner Melissa Strawbridge ("Strawbridge") is currently an inmate in the custody of

the New York State Department of Correctional Services ("DOCS").  On January 28, 2000,

after a bench trial, Strawbridge was found guilty in Albany County Supreme Court of

murder in the second degree and later sentenced to an indeterminate term of nineteen

_____

    [1] This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.4.

years to life, later reduced to fifteen years.  Am. Pet. (Dkt. No. 61) ¶¶ 1-4, 6; RA[2] 3744,

3776-77.  Strawbridge is presently serving that sentence.[3]  Strawbridge now seeks a writ

of habeas corpus pursuant to 28 U.S.C. § 2254 on the grounds that (1) the evidence was

insufficient to support the conviction,  (2) the statute was unconstitutional as it was applied

to her, and (3) the statute under which she was found guilty was unconstitutionally vague.

Am. Pet. ¶ 12.  Additionally, Strawbridge contends that various statements she made

should have been suppressed.  Pet. Memorandum of Law (Dkt. No. 59-2) at 130-36.  For

the reasons that follow, it is recommended that the petition be denied.


## I.  Background

Strawbridge, then twenty-one,[4] was charged with and convicted of depraved

indifference murder of a baby girl to whom she secretly gave birth in her parents' home

and whose body she later placed in a nearby trash container.  Because one of the issues

---

[2] "RA, 1" refers to the first volume of the record on appeal which contains documents produced by the petitioner to the court on a compact disc.  The Record on Appeal includes the transcripts from a suppression hearing as well as the trial and sentencing transcripts. Because the Record on Appeal was sequentially paginated, all page references will be to the Record on Appeal pagination located at the bottom of the page instead of the individual page numbers of the various included transcripts.

[3] Strawbridge commenced service of her sentence on April 19, 2000.  Her earliest release date is January 20, 2015.  See New York State Dep't of corrections & Community Supervision Inmate Information (visited Nov. 22, 2011) <http://nysdocslookup.docs.state. ny.us/GCA00P00/WIQ3/WTNQ130>.  This action was commenced on March 15, 2004 and has thus been pending for nearly eight years. Dkt. No. 1.  The action was stayed for five of those years at the request of Strawbridge.  See Dkt. No. 38 (order granting stay); Text Order dated 1/3/2011 (order lifting stay).  See subsection I(D) infra.

[4] Strawbridge was born August 5, 1975.  See New York State Dep't of corrections & Community Supervision Inmate Information (visited Nov. 22, 2011) <http://nysdocslookup. docs.state.ny.us/GCA00P00/WIQ3/WTNQ130>.

raised by Strawbridge challenges the sufficiency of the evidence, that evidence will be described in detail.

### A. Pretrial Hearing

### 1. Testimony

A pretrial hearing commenced on January 26, 1998 to determine whether various statements made by Strawbridge should be suppressed.  Dkt. No. 23-2 at 5.   On March 26, 1997, a 911 call came into the Colonie Police from Community Health Plan ("CHP"). RA, 1 at 831.  Officer O'Melia was sent to respond to the scene.  RA, 1 at 837-38.  Upon arrival, he was informed that an employee, later identified as Strawbridge, was determined to be pregnant during a pre-employment screening that she had undergone a few weeks earlier.  RA, 1 at 840-44.  Upon receiving this information, Strawbridge was in disbelief and despite the efforts of the medical staff associated with CHP, Strawbridge was highly reluctant to accept any of their assistance.  RA, 1 at 850-52. Strawbridge had returned to work on that day, visibly no longer pregnant, and had relayed to the CHP employees that she had delivered the baby at a hospital in Croton and that custody had been given to another individual, the paternal grandmother.  RA, 1 at 837-38, 852-53.  CHP attempted to confirm the whereabouts of the child, but could not because the paternal grandmother's information was unlisted.  RA, 1 at 837-38, 852. After unsuccessfully attempting to get Child Protective Services ("CPS") involved, CHP contacted the police in an effort to get the unlisted phone number.  RA, 1 at 849.

O'Melia called the police department back to update them on the events at CHP and

was told that the department was sending additional individuals to interview Strawbridge. RA, 1 at 849-50.  Shortly thereafter, a youth referral aide, Patrice Lockart, and Colonie Police Investigator, Michael Ruede, went to CHP to investigate concerns about the well-being of the Strawbridge infant.  RA, 1 at 361, 436-37, 856-58, 880-81.  Lockart and Ruede were both in civilian dress and rode in an unmarked police car.  RA, 1 at 399-400, 884, 918-19.  Lockart and Ruede arrived at CHP just before 3:00 p.m., introduced themselves to Strawbridge, and began to ask her about her pregnancy and the whereabouts of her baby.  RA, 1 at 364-66, 882-83.

Initially Strawbridge told the pair that she had given birth to her baby at a hospital in Croton, New York and that the child was remaining in Croton with an adoptive family.  RA, 1 at 364-66, 892, 898-99.  Strawbridge did not have the contact information for the family with her, contending it was located at her home, but told the police that she could retrieve the information but did not want her parents to discover her pregnancy or the resulting birth.  RA, 1 at 366-67, 898-99.  Lockart and Ruede expressed an interest in going to Croton to confirm the well-being of the child, as the birth could not be verified from independent conversations with the Croton hospital staff.  RA, 1 at 366-69, 396-97, 900. Strawbridge agreed to accompany them to Croton.  RA, 1 at 369, 901.

While Ruede was in the other room, Lockart engaged Strawbridge in further conversation.  At that time, Strawbridge reported to Lockart that the baby was not in Croton.  RA, 1 at 369-70.  Strawbridge described to Lockart how, on Monday March 24, she had gone home, to her parents' house, early from work sick.  RA, 1 at 370-71.  Later that evening, after going to bed, Strawbridge felt like she needed to go to the bathroom. RA, 1 at 370-71, 438.  She proceeded to the bathroom closest to her room where she

4

gave birth, which she picked up and saw move, and ultimately placed it in a trash bag, tied the bag, and disposed of it outside of the house with the trash.  RA, 1 at 369-72.

Upon finding Ruede, Lockart related to him Strawbridge's story, and brought him back into the room with Strawbridge.  RA, 1 at 902-04.  Lockart never advised Strawbridge of her constitutional rights and asked her to repeat the story for Ruede.  RA, 1 at 417-19. Based upon this new information, Ruede informed Strawbridge that this case was outside of his jurisdiction and indicated that the State Police would be ultimately responsible for its investigation.  RA, 1 at 441-43, 447, 910-16.  Lockart and Ruede asked Strawbridge if she would accompany them to the State Police barracks for additional questioning, and she agreed.  RA, 1 at 915-16. Prior to leaving with Lockart and Ruede, Strawbridge proceeded to a different building, where her office was located, to secure her personal belongings. RA, 1 at 450, 973-74. Strawbridge proceeded unescorted to her office.  RA, 1 at 450, 975-77.  Lockart and Ruede remained in the unmarked police car, unable to view where Strawbridge went once she entered the building, and awaited her return.  RA, 1 at 450, 976-77.  Strawbridge returned to the vehicle a few minutes later, entered the back seat, and proceeded to the State Police barracks with Lockart and Ruede.  RA, 1 at 977-78.

Upon arriving at the State Police barracks, Strawbridge was escorted into an interview room where she met with State Police Investigator Sullivan around 5:00 p.m.  RA, 1 at 490-93.  Upon entering the room, Sullivan advised Strawbridge of her constitutional rights and received an acknowledgment from Strawbridge that she understood such rights and was still willing to speak with the authorities.  RA, 1 at 490-93, 551-52.  After a brief conversation, Sullivan asked Ruede to also enter the interview room and Strawbridge was again advised of her rights.  RA, 1 at 497, 628-31, 926-32, 1003-05.  Sullivan and

5

Strawbridge then wrote a seven page statement detailing the events of Strawbridge's delivery and disposal of the baby's body.  RA, 1 at 495, 934-37, 940-41.  The statement discussed Strawbridge's onset of labor while she was at work, leaving work early, driving home and stopping to get a video, having dinner with her parents, retiring to her room to watch television, going to the bathroom around 11:00 p.m. and delivering the baby, observing the baby in the toilet, delivering the placenta, cleaning up the baby and placenta and placing them into garbage bags, and disposing of the bags.  RA, 1 at 608-09.  Consistent with earlier statements, Strawbridge again indicated that the baby had moved after it had been delivered.  RA, 1 at 522-24, 1030-34.

Sullivan, Ruede, Lockart and Strawbridge all left the station to attempt to find the dumpster where the baby's body was located.  RA, 1 at 465-66, 476-77, 949-50.  After first bringing them to an incorrect location, Strawbridge eventually directed the authorities to a dumpster in a local apartment complex, where she indicated precisely in which dumpster and bag the baby's body was located.  RA, 1 at 480, 508-16, 952-53, 989-1000.  The bag was retrieved by the authorities and the presence of the body was confirmed by Dr. Wolf, the medical professional who would then perform the autopsy on the body.

After discovering the corpse, Lockart, Ruede, and Sullivan proceeded to the Strawbridge residence.  RA, 1 at 481-82, 517-18, 956.  Upon arrival, they discovered that two other State Troopers, Officers Wingate and Horton were already at the home.  RA, 1 at 482, 723, 767-69.  While Wingate and Horton were at the house, prior to Strawbridge's arrival, the officers discussed a consent to search the house with Mr. and Mrs. Strawbridge.  Mr. Strawbridge then placed a phone call to his personal attorney, who in turn contacted Terrence Kindlon, a criminal defense attorney.  RA, 1 at 723-24, 775, 1068-

6

71, 1310-12, 1521-23.  Mr. Kindlon contacted Mr. Strawbridge shortly thereafter, and spoke with Horton about the consent to search, ultimately advising the Strawbridge's to sign the consent paperwork.  RA, 1 at 724, 734-35, 775-82, 1073, 1312-14, 1526-30.  At or about the time that Horton and Kindlon were speaking, Strawbridge and the other officers arrived at the Strawbridge residence.  RA, 1 at 725-27, 778-79, 1316, 1537-38.  Strawbridge had a discussion with her parents when she entered the home and declined her mother's invitation when she was asked if she wanted anything.  RA, 1 at 1266-67.

The State Police then searched the Strawbridge residence.  RA, 1 at 962, 1083, 1318-21.  Shortly thereafter, Ruede, Lockart, Sullivan and Strawbridge left the Strawbridge residence to return to the State Police barracks and await Strawbridge's arraignment.  RA, 1 at 963-64.  On the way to the barracks, Ruede stopped at Burger King and Strawbridge requested food and a drink.  RA, 1 at 987-88.  During the various discussions with Strawbridge and her transportation with the officers, they observed that she was calm, quite, alert, and able to communicate.  RA, 1 at 1042-43.


## 2.  The Court's Decision

On December 7, 1999, the court held that, first, the initial investigation conducted by Ruede and Lockart, when they first arrived at CHP, was non-custodial because (1) the questioning was related to an investigation and as such was investigatory and not accusatory in nature, (2) both individuals were in plainclothes and "were patient and courteous and did not exhibit a threatening or coercive demeanor," (3) Strawbridge was neither handcuffed or physically restrained, and (4) Strawbridge did not voice any objections to questioning, refuse to answer the inquiries, or ask the police to leave, but

voluntarily deciding to cooperate and answer the questions posed.  Dkt. No. 23-2 at 12-13.

However, "[a]dmissions made in a noncustodial situation transform it to a custodial situation, thus triggering the obligation of the police to give the Miranda warning."  Dkt. No. 23-2 at 13 (citations omitted).  Accordingly, after Strawbridge admitted to criminal conduct in the presence of Lockart, incriminating herself by her inculpatory statement, the inquiry should have ceased until Miranda warnings were administered.  Id.  Accordingly, because Lockart left the room to retrieve Ruede and have Strawbridge recount the story instead of immediately advising her of her rights, any statements made to Ruede and Lockart during the second conversation with Strawbridge were suppressed.  Id. at 13-14.

"The subsequent statements made by Strawbridge after the advice of rights were tainted unless a definite pronounced break in the questioning is established."  Dkt. No. 23-2 at 14 (citations omitted).  Such a break was found between the time that the un-mirandaized statements were made at CHP and she provided her statement at the police barracks because Strawbridge agreed to accompany Ruede and Lockart to the State Police barracks knowing that Ruede did not have the appropriate jurisdiction to investigate the situation and was permitted to go to her office, unescorted, to secure her personal belongings.  Id. at 15.  The pair waited for Strawbridge, in an unmarked car, without restricting Strawbridge's movement, for her voluntary return to the car and eventual transport to the barracks.  Id.  This "hiatus" provided the necessary break to restore her to a position where she was deemed not to be under questioning.  This finding was bolstered by the circumstances that Strawbridge was not being treated like she was in custody, was not restrained, knew that the officers present did not have jurisdiction over the case, was asked and acquiesced to accompanying the officers to the State Police barracks, and was

8

permitted to go into a foreign office building alone and unintended where she had the opportunity to make calls or seek advice as to what to do next.  Id.  Thus, because of this pronounced break, the statements later made to Sullivan at the State Police barracks after advice of rights were found to be admissible due to Strawbridge's waiver.  Id.

The court also determined that the consent forms, and any evidence obtained therefrom, were also properly executed and that none of that evidence should be suppressed.  However, any statements made by Strawbridge to the authorities after Mr. Strawbridge, Horton, and Mr. Kindlon all spoke to one another on the phone are suppressed since at that time Strawbridge's right to counsel had attached and "[n]o further questioning was authorized . . . ."  Id. at 16-18.  No further inquiries were made of Strawbridge after they left her parents' house.


## B. Trial

### 1. Strawbridge's Knowledge of Her Pregnancy

Strawbridge had been in a relationship with Brian Reilly.  RA, 1 at 2097. In the late summer of 1996, the couple temporarily resided with Reilly's mother, Maryann Junkins, and then-boyfriend, Kevin Junkins, while they were both working in the area.  RA, 1 at 2090-92, 2099-100, 2483-84.  While Strawbridge lived at the residence, Maryann Junkins noticed that she was sick in the morning, her face was bloated, and that, because she was responsible for emptying the trash, Strawbridge was not using sanitary products which indicated she was no longer menstruating.  RA, 1 at 2108-110.  Maryann approached Strawbridge and told her that she thought that she was pregnant and offered her support,

both financial and emotional, and also offered to adopt the child if Strawbridge did not feel she was ready to be a parent.  RA, 1 at 2107-08.  Strawbridge denied that she was pregnant and left Reilly, moving back home to her parents' house, shortly thereafter.  RA, 1 at 2101-103, 2116.

Reilly testified that a few weeks prior to Strawbridge leaving, in September 1996, she told him that she had missed her period for the past few months.  RA, 1 at 2487. Reilly suggested that Strawbridge be examined by a physician and expressed that he thought an abortion would probably be the best course of action.  RA, 1 at 2488.  Reilly also offered to pay for the procedure, but Strawbridge stated that she did not want to see a physician at all.  Id.  Strawbridge and Reilly spoke again in December, and Strawbridge lied and told Reilly that she had seen a physician and that she was not pregnant.  RA, 1 at 2493.

During this time, Strawbridge found temporary employment at CHP.  Strawbridge was eventually offered a permanent position and accepted it, though as a condition of employment she was required to undergo a physical.  RA, 1 at 2537.  On February 21, 1997, Monica Pfohl, a physician's assistant employed by CHP, performed the physical on Strawbridge and informed her that she thought that she was pregnant.  RA, 1 at 1848-52, 2537.  Strawbridge denied that pregnancy was a possibility, reporting that she had maintained a normal menstruation cycle and that there was no possibility that she was pregnant.  Id.  Pfohl approached a friend at CHP, Judith Blanchard, an OB/GYN nurse practitioner, to confirm whether Strawbridge was pregnant.  RA, 1 at 1957, 2023-24. Strawbridge agreed to the additional examination.  RA, 1 at 2025-26.

Blanchard examined Strawbridge and attached a fetal monitor to her abdomen.  RA, 1 at 2025-26.  The monitor found and amplified the baby's heartbeat.  Id.  Upon hearing the

10

heartbeat, Strawbridge stated that she did not want the baby.  RA, 1 at 1851-52, 2026-27, 2053-56.  The women explained to Strawbridge that her pregnancy had progressed too far to have an abortion and discussed various other options such as adoption.  RA, 1 at 1852-53.  Strawbridge was also advised that she should receive pre-natal treatment.  Blanchard also performed an ultrasound on Strawbridge which established that she was 38-weeks pregnant.  RA, 1 at 2027-28.  Strawbridge relayed to the women that the father of the child, Reilly, did not know she was pregnant and did not want a baby because he hated children.  RA, 1 at 1852-53, 1958.  Strawbridge became emotional, so Pfohl went to the pharmacy to pick up her prenatal vitamins before Strawbridge departed.  RA, 1 at 1854-56, 1959-60.

During the follow-up appointment on March 5, 1997, Strawbridge and Blanchard discussed the results of the ultrasound as well as what Strawbridge could expect in the weeks to come.  The ultrasound showed evidence of hydronephrosis and a cyst, something that could be inconsequential and was not uncommon, but which required follow-up care.  RA, 1 at 2037.  Strawbridge was never told that the ultrasound indicated that the baby had a serious health problem.  RA, 1 at 2038.  Strawbridge was also given various pamphlets and a video, as well as counseled on what she could expect with the onset of labor and her impending delivery.  RA, 1 at 1882-83, 1886, 2039-40, 2266-72.  During that meeting, Strawbridge was also counseled by Susan Firneisz, a trained social worker on the crisis team that completed a mental status exam on Strawbridge and concluded that she heard and understood the information that she was pregnant, even though she disagreed with the CHP employees about informing her parents of the pregnancy or developing a plan about what should occur once she went into labor.  RA, 1

11

at 1879-82, 2289-96, 2307-08.

On March 23, 1997, Strawbridge called Reilly and told him that she had something important to tell him, but that she could not share it with him over the telephone and requested his address.  RA, 1 at 2494-496.  Reilly gave Strawbridge his work address and received a letter from her sometime after March 24, 1997 explaining that she was pregnant but that "neither of [them] have any obligations because [the baby is] going to die," and requesting that the two of them begin to spend time together again when the birth was over with.  RA, 1 at 2497-2500, 2515-517; RA, 2 at 93-94.

On March 24, 1997, Strawbridge was observed by a coworker to be grabbing the sides of her desk, stiffening and relaxing intermittently, clearly uncomfortable and in pain.  RA, 1 at 2437-38.  Strawbridge's coworkers suspected that she was pregnant, but had not discussed this situation with her.  RA, 1 at 2438-39, 2460-61, 2543-44.  One employee also saw Strawbridge's discomfort, and contacted her supervisor.  RA, 1 at 2462-63, 2472-73.  The supervisor asked the employee to document what Strawbridge was doing and to report back to her, and counseled her against directly asking Strawbridge what was wrong or involving any of the medical departments in the situation.  RA, 1 at 1815-18, 2462-63, 2469-74.  The employee also saw Strawbridge writing the letter to Reilly.  RA, 1 at 2462-63.  Later in the afternoon, Strawbridge asked if she could leave work early to attend a doctor's appointment.  Her supervisor, Marsha Griffith, agreed.  RA, 1 at 1790-91, 1819.

### 2. Strawbridge's Absence From and Return to Work

The following morning, March 25, 2007, Strawbridge left a message on Griffith's voice

12

mail that she was too sick to report to work.  RA, 1 at 1792.  Griffith contacted Blanchard

to advise of the message.  RA, 1 at 1793-94, 1889-90.  Pfohl then contacted Strawbridge,

who assured Blanchard that she had not gone in to labor, had not delivered the baby, and

was feeling better.  RA, 1 at 2043-46.  The following morning, Strawbridge again called

into work, advising that she needed the morning off, but would report in the afternoon.

RA, 1 at 1794-95.

Strawbridge reported to work that afternoon looking very pale and tired, with dark

circles under her eyes.  RA, 1 at 1795-96.  Upon seeing Strawbridge, Griffith called Pfohl,

who immediately came to Strawbridge's office and noted the same physical attributes that

Griffith had observed.  RA, 1 at 1796-98, 1892-94, 1990-91.  Both women believed that

Strawbridge was no longer pregnant, having given birth sometime in the last forty-eight

hours.  RA, 1 at 1798, 1992.  Strawbridge was called into Griffith's office where she met

with various individuals, including Pfohl and Firneisz, about the status of Strawbridge's

pregnancy.  RA, 1 at 1798,1892-93, 2273.  Strawbridge reported that she was feeling fine

and that she had previously delivered the baby at the Croton Hospital.  RA, 1 at 1894-96,

2274.  Strawbridge could not remember the name of the physician who delivered the

baby, and when the women from CHP called to verify the admission and birth, Croton

Hospital indicated that they had no records of Strawbridge or her delivery.  RA, 1 at 1894-

98, 2274.  After further discussion, the women contacted Child Protective Services

("CPS"), which declined to take any action.  RA, 1 at 1897-98, 2277-80.  The Colonie

Police were then contacted to locate the paternal grandmother who allegedly had custody

of the baby.  RA, 1 at 2280.

While awaiting the police, Strawbridge discussed the circumstances of the birth with

13

Firneisz.  RA, 1 at 2280.  Strawbridge reported that the paternal grandmother had driven

to Albany and picked her up, taken her to the Croton Hospital for the delivery, kept the

baby, and transported Strawbridge back to Albany so that she could report to work that

week.  RA, 1 at 2280.  Officers Ruede, Lockart, and Sullican then reiterated their

testimony at the pretrial hearing concerning Strawbridge's questioning, Strawbridge's

written statement, the discovery of the corpse, and the arrest.  RA, 1 at 2122-53,  2158-

2249.  2334-64.

In her statement, Strawbridge detailed how she gave birth at home to the baby in her

parents' bathroom, feeling that she had to go to the bathroom and that, upon sitting on the

toilet, the baby emerged.  RA, 1 at 2220-224.  When she was looking at her baby in the

toilet water, she felt additional pressure and sat down again and delivered the placenta.

RA, 1 at 2224-226.  Strawbridge then cleaned herself up and when she checked the toilet,

the baby was not moving.  RA, 1 at 2242-43.  Strawbridge then collected garbage bags,

gloves and paper towels and disposed of the body and placenta into the garbage bag, tied

up the bag, and laid it on the bathroom floor while she returned to her bedroom to watch

television.  RA, 1 at 2245.  Approximately five hours later, Strawbridge arose from her bed,

saw the bag in the bathroom, and  returned to bed.  RA, 1 at 2245-46.  Later in the

morning, after her parents had left the house, she dressed, grabbed the bag, placed it in

the trunk of her car, and drove to the town dump where she ultimately disposed of the

body in the dumpster.[5]

---

[5]This initial statement about where the body was discarded was later proven to be
untrue, and Strawbridge eventually disclosed the actual location to the officers as they
evening progressed.

After Strawbridge pointed out where the body was located, another State Police Officer, Ullman, took photos of the bag where it was found in the dumpster.  RA, 1 at 2373.  By tearing a small hole in the bag, Ullman confirmed that there was an inside bag matching an earlier description that Strawbridge had provided.  RA, 1 at 2376.  Ullman palpated the outside of the bag and felt an object that was cold and stiff, showing no signs of life, presumed to be the corpse of the baby.  RA, 1 at 2376-78, 2404.  The bag was left undisturbed until the arrival of Dr. Barbara Wolf.  RA, 1 at 2377-78, 2404.  Dr. Wolf transported the body to Albany Medical Center where an autopsy was performed.  RA, 1 at 2379.   Inside the plastic bag, in addition to the corpse, placenta, and umbilical cord, were CVS Pharmacy latex gloves.  RA, 1 at 24-4-405.  Inside Strawbridge's car, authorities also found a CVS Pharmacy bag containing various recently purchased items. RA, 1 at 2411-412.

### 3. Testimony of Medical Experts

### a. Prosecution

Dr. Wolf, a forensic pathologist, completed the autopsy.  RA, 1 at 2600-609.   Dr. Wolf's external examination showed that the baby was full term, approximately 38- 39 weeks old.  X-rays of the body and examination of the organs showed normal development except for the right kidney and lungs.  RA, 1 at 2611-613.  The appearance of the kidney held no significance with respect to the cause of death.  RA, 1 at 2613.  The placenta also appeared to be normal.  RA, 1 at 2613-14.  The external exam revealed no external or internal injuries which would explain the cause of death or decomposition of

the body.  Id.  The body was free of hemorrhage, trauma, bleeding, bruising, or fractures.
RA, 1 at 2679-82.

Slides which were prepared from various bodily tissues showed evidence of infection
in the placenta and umbilical cord.  RA, 1 at 2615.  The slides also showed evidence of
pulmonary interstitial pneumonia, consistent with the aforementioned of infection.  RA, 1 at
2615-16.  Dr. Wolf testified that in her opinion, the findings of pneumonia did not change
her ultimate opinion as to the cause of death.  The slides of the lungs also illustrated an
uneven aeration pattern within the lungs, demonstrating the presence of air filled spaces
within the lungs.  RA, 1 at 2619-20.  Such a pattern, according to Dr. Wolf, was not
consistent with an insufficient amount of air being available to the baby but of the normal
breathing pattern which all infants experience.  RA, 1 at 2697-2701.

Dr. Wolf asserted that the baby was expelled from Strawbridge's body, having an
independent existence from her mother, as evidenced by the presence of air in her lungs.
RA, 1 at 2706-08, 2745.  The presence of the uneven aeration and breathing led her to
the conclude that the baby had an independent circulation, though there was no way to
determine when exactly that happened or how long it lasted.  RA, 1 at 2707-08.  In
addition to the evidence on the slides, Dr. Wolf also relied upon the investigation and
notes which indicated that Strawbridge had witnessed the baby move.  Dr. Wolf opined
that the cause of death was asphyxia as a result of the baby being delivered into a toilet
and then placed in a plastic bag which was knotted closed which caused the cessation of
oxygen to the infant's brain.  RA, 1 at 2729-30, 2740.  Dr. Wolf concluded that the baby
was alive for at least a matter of minutes.  RA, 1 at 2626-27.  Dr. Wolf's conclusions also
referenced the presence of interstitial breathing patterns, a finding common to infants that

are struggling to breathe and commonly receiving resuscitation.  RA, 1 at 2744.  Dr. Wolf also indicated that the type of infection seen in the placenta and umbilical cord was sufficient to cause the death of a fetus, though she testified that infection was not the cause of death for the Strawbridge baby.  RA, 1 at 2724-25.

Dr. Keough, a perinatal pathologist, examined the histological slides of the baby as well.  RA, 1 at 2754-62.  Dr. Keough also agreed that the Strawbridge baby was well nourished and fully developed, born alive, with an amniotic fluid infection, and no evidence of chronic in-utero stress.  RA, 1 at 2762-64.  She opined that the cause of death was respiratory death and, specifically, the failure of the baby to sustain breathing repetitions over a prolonged period.  RA, 1 at 2795-96, 2931.  Dr. Keough also testified that the presence of interstitial air pattern in the baby was odd because that was not a finding expected in fetuses and its presence generally indicated that the baby was on a respirator.  RA, 1 at 2940-42.

Dr. Keough further testified that there was no evidence that the baby died of birth asphyxia.  RA, 1 at 2770-72.  Dr. Keough also indicated that infection could not be ruled out as the cause of death.  RA, 1 at 2959.  However, Dr. Keough only observed a few squamous cells in the baby's lungs, indicating that the baby was not gasping and was not in great distress in-utero.  RA, 1 at 2764-66, 2793-94.  Accordingly, her opinion as to the cause of death was consistent with Dr. Wolf's.  She reiterated that a drowning victim may have no water in his or her lungs, and the absence or presence of water in varying degrees did not preclude drowning as the cause of death and that the absence of hemorrhaging or other physical symptoms did not preclude asphyxia as the cause of death.  RA, 1 at 2960-61.  Dr. Keough also agreed with Dr. Wolf that the baby was born

17

alive, had an independent circulation from Strawbridge, and was able to carry on without the assistance of her mother's circulatory system.  RA, 1 at 2773-74.  Additionally, Dr. Keough agreed that the baby was breathing for anywhere from several minutes to not more than two hours before she died.  RA, 1 at 2972.

### b. Defense and Rebuttal

Dr. Singer, a pathologist, testified for the defense and also examined the histological slides.  RA, 1 at 3010-13, 3029-30.  Dr. Singer disagreed with the previous medical testimony, proclaiming that if asphyxia was the cause of death hemorrhaging of the lungs, heart, eyes, or thymus would probably, but not always, be evident.  RA, 1 at 3046-47, 3056-58, 3177-178.  Dr. Singer could not confirm or deny, based on the slides, whether the baby had taken a breath, how many breaths, or whether the baby had been fully expelled from Strawbridge when these breaths occurred.  RA, 1 at 3067-72.  Moreover, Dr. Singer opined that the slides could not establish whether the baby's alleged breathing occurred before or after the placenta attached, calling into question whether the baby truly had an independent circulatory system.  Id.  Dr. Singer also testified that multiple other causes of fetal death, which while not documented, could still be caused from birth asphyxia due to cord compression or becoming stuck in the birth canal due to hypertonic uterine contractions, which could have prevented oxygen from reaching the baby and causing her death.  RA, 1 at 3063-64, 3180-81.

Dr. Singer opined that the baby was stillborn as a result of what he characterized as the overwhelming infection present in Strawbridge.  RA, 1 at 3113-114. The presence of an immune response in both the mother and baby, as demonstrated by the presence of

18

white blood cells and squamous cells on the slides, indicated the pervasiveness of the infection.  RA, 1 at 3080-83.  According to Dr. Singer, this infection would have resulted in death regardless of where Strawbridge delivered the baby and whether immediate medical attention was available.  RA, 1 at 3087, 3189-90.  Dr. Singer agreed that the presence of uneven air expansion in the lungs was consistent with live birth and a baby taking one or more breaths, though he felt that the air pockets present on the slides were due to an attempt at resuscitation, even though there was no testimony offered to that effect.  RA, 1 at 3197-3205.  Finally, Dr. Singer concluded that any perceived motion of the baby was actually initiated by either Strawbridge's voluntary movements, since the child was still attached to her via the umbilical cord, or due to movement in the water in the toilet.  RA, 1 at 3238-241.

Dr. Michael Hogan, head of the neonatal division at Albany Medical College, offered rebuttal testimony for the prosecution that, based on Dr. Keough's findings of air in the lungs and uneven ventilation, the baby was born alive and lived for a period of minutes to hours.  RA, 1 at 3406-16.  Moreover, Dr. Hogan indicated that if the baby did have congenital pneumonia, that she could have survived given the appropriate treatment.  RA, 1 at 3418-22.   Dr. Hogan testified that mortality rates for a full term baby suffering from congenital pneumonia are approximately 25% and most of those infants that succumb to the infection had a low birth weight or earlier gestational age.  RA, 1 at 3420.  As the Strawbridge baby was born full-term, well nourished, well grown and with no obvious abnormalities, it was Dr. Hogan's medical opinion that she would have survived.  RA, 1 at 3421-22.

Dr. Hogan also agreed with the other medical experts that interstitial air patterns are

19

not something that one would expect to find in a healthy fetus, and was currently found in

infants with respiratory distress that were on respirators.  RA, 1 at 3477-478.  In his

experience, he had not heard of a case of such patterns being caused by CPR, but

explained that interstitial air patterns were generated by positive air pressure being forced

in the lungs potentially strong enough to explain the findings seen in this case.  RA, 1 at

3479-86.


### C.  Appeals

Strawbridge was found guilty by the trial court and, represented by her trial counsel,

appealed.  RA, 2 at 1.[6]  The Appellate Division affirmed her conviction.  People v.

Strawbridge, 299 A.D.2d 584 (3rd Dep't 2002) (hereinafter "Strawbridge I").  The Appellate

Division held that the County Court's decision regarding the suppression hearing was

correct because the initial discussion between Strawbridge and the Colonie Police at CHP

> was genuinely investigative and noncustodial up until . . .
> [Strawbridge] first admitted [to] giving birth at home and disposing
> of the baby in a plastic bag [because p]rior to that point, police had
> no information as to the baby's fate or that [Strawbridge had
> committed any crime, [Strawbridge] was not arrested or accused of
> any wrongdoing, and [Strawbridge] did not request to leave or raise
> objections to answering their nonaccusatory questions.

Id. at 588 (citations omitted).  Additionally, the Appellate Division found that Strawbridge

had properly been advised of her rights and waived them because of the "definite,

pronounced break in the interrogation such that [Strawbridge] may be said to have

returned, in effect, to the status of one who is not under the influence of questioning."  Id.

---

[6] "RA, 2" refers to the second volume of the record on appeal, also produced to the
Court on a compact disc.

at 589 (internal quotation marks and citations omitted).  The Appellate Division pointed to the circumstances surrounding Strawbridge's decision to accompany the officers back to the State Police voluntarily barracks in their unmarked vehicle after returning to her office, unescorted and unrestrained.  Id.

The Appellate Division then discussed the legal sufficiency of the evidence upon which Strawbridge was convicted.  The Court recognized Strawbridge's argument as three-fold, challenging "that her conduct was reflective of depraved indifference to human life or that she acted with the requisite extreme recklessness; that the baby was born alive; and that her actions caused the death of the baby."  Id. at 592.  First, the court defined the mens rea requirement as an "awareness and conscious disregard of a substantial and unjustifiable risk" which "is defined by the degree of danger presented" by the defendant in "refer[ence] to the factual setting in which the risk creating conduct . . . occur[red]."  Id. (citations omitted).  Thus, the court did "not [focus] on the subjective intent of the defendant, but rather upon an objective assessment of the degree of risk presented by defendant's reckless conduct."  Id. (citations omitted).  The court also distinguished between the degree of risk required for manslaughter versus depraved indifference murder, noting the subtle differences.  Id. at 592-93 (citations omitted).

The Appellate Division "view[ing] the evidence in the light most favorable to the prosecution" found "that there was a valid line of reasoning and permissible inferences from which the trier of fact could have found defendant guilty of depraved mind murder" because of Strawbridge's admission to the police about placing her baby into a sealed plastic bag shortly after giving birth and crediting the prosecution's expert testimony about the baby being born alive.  Strawbridge I, 299 A.D.2d at 593.  The court acknowledged

21

that

> while a different finding would not have been unreasonable – for example, a finding that the child was stillborn or died from congenital pneumonia unrelated to defendant's actions or that defendant did not act with the requisite extreme recklessness – we cannot conclude that the verdict was contrary to the weight of the evidence.  We have extensively reviewed and are troubled by the sharp and critical conflicts in the expert testimony – all of it seemingly provided by competent and highly experienced pathologists – regarding the issue of whether the baby was born alive or was still born . . . However, we cannot assign error in the trier of fact crediting the People's experts over that of defendant's experts, finding deference to be appropriate to the factfinder's opportunity to hear and observe these witnesses.

Id. at 593 (internal citations omitted).  However, given "the extenuating and extraordinary circumstances under which [Strawbridge's conduct occurred" the Appellate Division reduced her sentence from nineteen to fifteen years to life, in the interests of justice, given the "many mitigating factors . . . [including her] youth, . . . lack of criminal history, . . . positive educational and employment record, . . . impaired emotion and mental health and the psychiatric evidence submitted by defense counsel at sentencing."  Id. at 594.

Still represented by her trial counsel, Strawbridge sought leave to appeal  to the New York Court of Appeals.  RA, 2 at 139-47.  On March 12, 2003, leave to appeal was denied as "[t]here [wa]s no question of law presented which ought to be reviewed by the Court of Appeals . . . ."  RA, 2 at 148.  On June 19, 2003, new appellate counsel for Strawbridge filed an untimely motion seeking reconsideration of the previous Court of Appeals denial. RA, 2 at 149-57.  On August 13, 2003, the Court of Appeals denied the request for reconsideration for the same reasons.  RA, 2 at 158.

22

**D. Proceedings in Federal Court**

On March 2, 2004, represented by the new appellate counsel, Strawbridge filed a

petition for habeas corpus.  Pet. (Dkt. No. 1).  On March 2, 2006, the Court issued a stay

in the present proceedings to allow Strawbridge to bring a collateral state court proceeding

to challenge her current conviction.  Dkt. No. 38; see also note 3 supra.  The Appellate

Division denied Strawbridge's motion for collateral attack.  People v. Strawbridge, 76

A.D.3d 115 (3rd Dep't 2010) ( "Strawbridge II").  The court explained that Strawbridge's

conviction became final on June 10, 2003.  Id. at 117.  The court explained that from June

2003 through 2006 the case law regarding depraved indifference murder had evolved,

Strawbridge sought a "retroactive application of depraved indifference murder law as

articulated in 2005, but her requests were denied because the Court of Appeals had

already determined that "in a habeas corpus proceeding . . . , changes in depraved

indifference murder jurisprudence . . . do not apply, as here, to cases in which judgements

of conviction became final prior thereto."  Id. at 117-19.

Moreover, while the court recognized Strawbridge's "efforts to formulate novel issues

under the new depraved indifference standards, and to distinguish her collateral attack

from others so as to obtain piecemeal retroactivity, retroactivity is precluded," and "no

danger or of a miscarriage of justice," is found.  Strawbridge II, 76 A.D.3d at 120 (citations

omitted).  The court also held that there was no "demonstrat[ion] that federal constitutional

principles require[d] retroactive application . . . [a]s [Strawbridge] failed to cite any authority

for the proposition that state courts are required to retroactively apply new state judicial

formulations of the elements of a criminal statute that are adopted after convictions are

final . . . . "  Id. at 120-21.  Finally, the court declined to address any arguments regarding

23

the alleged constitutional vagueness of the depraved indifference statute as those arguments had not previously been raised on appeal.  Id. at 121.  Strawbridge sought to appeal the denial of her collateral attack, but her application was denied by the Court of Appeals on October 27, 2010.  People v. Strawbridge, 15 N.Y.3d 895 (N.Y. 2010) (hereinafter "Strawbridge III").

Strawbridge then moved in this Court to lift the stay and for leave to amend the habeas petition due to the perceived changes in the application of the depraved indifference murder standard.  Dkt. No. 54.  The stay was lifted and permission granted to amend the complaint.  Dkt. No. 58.   On March 30, 2011, Strawbridge filed an amended petition.  Am. Pet. (Dkt. No. 61).

## II.  Legal Standards

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a federal court may grant habeas review only if state court proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)-(2) (1996).  When evaluating a habeas petition, "a determination of a factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court

24

arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). Under the "unreasonable application" clause, a federal court may review the habeas petition if the state court's application of Supreme Court precedent was "objectively unreasonable." Id. at 409.

### III. Exhaustion

Before seeking habeas review, a petitioner must first exhaust all state remedies. 28 U.S.C. § 2254(b), (c). The petitioner must have "given the state courts a fair opportunity to pass upon his federal claim." Daye v. Att'y Gen., 696 F.2d 186, 191 (2d. Cir. 1982). The petitioner may alert the state court to his federal claim by citing the Constitution, relying on federal case law, relying on state cases employing constitutional analysis to a similar fact pattern, stating the claims in a specific way as to contemplate a constitutional provision, or presenting a fact pattern that is common in constitutional litigation. Id. at 194.

In this case, Strawbridge has exhausted her claims concerning sufficiency of the evidence by presenting them to the Court of Appeals.[7] Additionally, Strawbridge

---

[7] In respondent's brief, there is an unresolved discussion about whether the third basis for legal insufficiency was exhausted by Strawbridge's earlier state appeals. Resp. Mem. of Law (Dkt. No. 23) at 37. Due to the extensive discussion of the elements of depraved indifference murder and the discussion in Strawbridge's Appellate brief, it appears that this element was sufficiently presented to the state court for consideration on appeal. Regardless of its procedural posture, for the reasons discussed infra the argument is meritless.

presented arguments about the constitutionality of the application of the depraved indifference murder statute, and its apparent vagueness, during her collateral appeal after the decision of subsequent cases which Strawbridge alleged resulted in a retroactive clarification in the controlling law.  While her claims about legal sufficiency were clearly required to be brought on direct appeal, the questions regarding constitutionality of the application of the statute were arguably not called into question until the subsequent court decisions.  Accordingly, such claims were justifiably raised on collateral, instead of direct, appeal.  Reyes v. Keane, 118 F.3d 136, 139 (2d Cir. 1997) ("Section 44-.10(2)(c) . . . mandates that the state court deny any [collateral] motion where the defendant unjustifiably failed to argue such constitutional violation on direct appeal despite a sufficient record.") (citations omitted).

However, Strawbridge's claims that statements should have been suppressed have not been exhausted because while she addressed such issues in her application to the Appellate Division (RA, 2 at 2), she failed to include these same arguments in her leave application to the Court of Appeals (RA, 2 at 139-40).  Exhaustion of available state remedies requires presentation of the claim to the highest state court from which a decision can be had." Daye, 696 F.2d at 190 n.3.  Much like the objection regarding legal sufficiency, this too is a record-based objection which was required to be discussed on direct appeal.  As Strawbridge partially failed to successfully present these claims to the highest state court which may have rendered a decision, these claims are not exhausted.

While failure to exhaust claims generally prohibits a habeas court from evaluating a claim on the merits, an unexhausted claim is deemed exhausted when there is no

alternative means to exhaust that claim.  See Castille v. Peoples, 489 U.S. 346, 351 (1989).  The lack of a state court forum to exhaust the claim results in "procedural default." See generally Reyes v. Keane, 118 F.3d 136, 140 (2d Cir. 1997) (citations omitted) ("[A] claim is procedurally defaulted for the purposes of federal habeas review where 'the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'").

Even though certain of Strawbridge's claims are unexhausted and she is in procedural default, the AEDPA allows the writ to be "denied on the merits, notwithstanding the failure . . . to exhaust . . . ." 28 U.S.C. 2254(b)(2).  Thus, although the habeas petition includes both exhausted and unexhausted claims, this Court may still review the merits of these claims.

## IV.  Merits

### A. Due Process

The requirements which currently support the charge of depraved indifference murder are different from those that were in existence at the time Strawbridge was indicted and convicted.   "Currently, under New York Law, a person is guilty of depraved indifference murder if under circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person." Baptiste v. Ercole, 766 F. Supp. 2d 339, 347 (N.D.N.Y. 2011) (citing N.Y. Penal Law § 125.25(2))(internal quotation marks omitted).

27

However, at the time Strawbridge was indicted and convicted, "[d]epraved indifference crimes contained both a mental element (recklessness) and a voluntary act (engaging in conduct which creates a grave risk of death to another person . . . [with t]he relevant focus . . . on the objective circumstances in which the act occurred, and those circumstances defined the degree of risk created by the defendant." Id. (citing People v. Register, 60 N.Y.2d 270 (1983); Policano v. Herbert, 7 N.Y.3d 588 (2006)).

As the Second Circuit has recently observed,

> From 1983 to 2002, the N.Y. Court of Appeals understood depraved indifference to [the People v. Register standard which] refer[ed] to neither the mens rea nor actus reus of the crime . . . but to the factual setting in which the risk creating conduct must occur. Under this formulation, the very facts establishing a risk of death approaching certainty and thus presenting compelling circumstantial evidence of intent . . . likewise demonstrated depraved indifference.  In 2003, however, in People v. Hafeez[8], the New York Court of Appeals departed slightly from this earlier understanding . . . recognizing that certain murders are so quintessential intentional that they cannot properly be catergorized as depraved indifference . . . The N.Y. Court of Appeals further eroded its prior case law in People v. Gonzalez . . . [and after] July 2003, the New York Court of Appeals decided a number of additional cases that further recast the Register . . . formulation of depraved indifference murder until finally, in People v. Feingold, the court formally overruled Register . . . .

Rivera v. Cuomo, 649 F.3d 132, 137-39 (2d Cir. 2011) (citing cases) (internal quotation marks and citations omitted).

Strawbridge's conviction is legally insufficient only if no rational trier of fact could have found her guilty of all the elements of depraved indifference murder as they existed

---

[8] The Hafeez case was decided on the day that Strawbridge's conviction became final.  People v. Hafeez, 100 N.Y.2d 253 (2003).

pursuant to the Court of Appeal's interpretation of the statute on June 10, 2003, the day

that Strawbridge's conviction became final.  Flowers v. Fisher, 296 Fed. Appx. 208, 210

("We look to New York law as it existed at the time [petitioner's] conviction became final,

as the New York Court of Appeals has found that although the law on depraved

indifference has changed significantly in recent years, those changes do not apply

retroactively.") (citing Policano v. Herbert, 7 N.Y.3d 588 (2006)).  The law as it existed at

the time of Strawbridge's conviction was based upon Register and Sanchez as those

cases were decided before her conviction became final.  Id.; see also Guzman v. Greene,

337 Fed. Appx. 27, 29 (2d Cir. 2009) (explaining that since People v. Feingold, "which

overruled . . .  Register and . . . Sanchez was decided after [petitioner's] conviction

became final, . . . [there is no] need . . . [to] discuss how, if at all, [petitioner's] case would

have been affected if Feingold had been decided earlier.").  Strawbridge's contentions are

that Suarez[9] should have been applied in determining the legal sufficiency of the evidence

against her and that the prior court's decision not to apply Suarez was unconstitutional.

First, as to Strawbridge's contentions that, in Strawbridge II, the Appellate Division

incorrectly applied this logic in dismissing her collateral appeal, such arguments are

untenable because there is no habeas relief accorded for determining "the correctness or

incorrectness of the Appellate Division's interpretation of New York law . . . ."  Baptiste,

766 F. Supp. 2d at 353 (citing Portalatin v. Graham, 624 F.3d 69 (2d Cir. 2010) ("Whether

---

[9] Suarez was decided on December 22, 2005, over two years after Strawbridge's conviction became final.  People v. Suarez, 6 N.Y.3d 202 (2005).  Suarez began the departure "from the Register formulation by making clear that the additional requirement of depraved indifference has a meaning independent of the gravity of the risk."  Baptiste, 766 F. Supp. 2d at 350 (citations omitted).

our Court agrees or disagrees with the Court of Appeals' construction of New York law is

of no moment.  As the Supreme Court has long held, state courts are the ultimate

expositors of state law and neither this Court nor any other federal tribunal has any

authority to place a construction on a state statute different from the one rendered by the

highest court of the State.") (citations and internal quotation marks omitted)).

Second, assuming a potential ground for habeas relief, because the Appellate Division

adjudicated Strawbrige's claims on the merits, it is entitled to deference unless its

determinations that (1) the date declared in Payne represented the turning point in the

depraved indifference laws and (2) no retroactive application of the new depraved

indifference laws were required in convictions which had already been finalized

represented a contrary or unreasonable interpretation of Supreme Court precedent.  In

Baptiste, a similar case where the petitioner was claiming legal insufficiency of the

evidence based upon the evolution of the depraved indifference murder standard, the

Northern District found that the "[t]he Appellate Division's conclusion that the law changed

when Payne was decided, [and that] . . . the changes in New York law do not apply

retroactively . . . do not violate [Supreme Court precedent] . . . because the Supreme

Court did not hold . . . that the Constitution requires the application of a new interpretation

of state law retroactively . . . ."  766 F. Supp. 2d at 355 (citations omitted).  Thus, the

decision of the New York Court of Appeals that due process does not compel the

retroactive application of the law after the Payne decision and that this represented a

"marked change [and not clarification] in the law" are also consistent with Supreme Court

precedent.  Id. at 355-56 (citing Henry v. Ricks, 578 F.3d 134, 138-41 (2d Cir. 2009)).[10]

Accordingly, the decision of the Appellate Division not to retroactively apply Suarez or any other cases decided after Strawbridge's conviction was finalized require due deference.  Moreover, the refusal to apply retroactively the new law regarding depraved indifference murder does not constitute a violation of Strawbridge's due process rights. Therefore, Strawbridge's amended petition on this ground should be denied.


**B. Vagueness**

Due process guarantees that criminal statutes have the requisite specificity to inform people of proscribed conduct. The vagueness doctrine is composed of two prongs, a notice prong and an enforcement prong.  Thus, criminal statutes are required to provide "sufficient definiteness that ordinary people can understand what conduct is prohibited . . . in a manner that does not encourage arbitrary or discriminatory enforcement." Mannix v. Phillips, 619 F.3d 187, 197 (2d Cir. 2010) (citations omitted).  Additionally, the Supreme Court has made clear that merely because "proscribed conduct may violate more than one statute does not render the statute void for vagueness."  Id. (citations omitted).  In cases which do not involve the First Amendment, vagueness challengers are evaluated "as applied to the facts of that particular case." Id.

---

[10] Strawbridge continues to assert that post-Sanchez cases represented a clarification, and not a change, in the law.  Pet. Mem. of Law (Dkt. No. 68) at2-7. Strawbridge's arguments regarding policy-based clarifications, while novel, are clearly not how the court has interpreted the evolving body of case law.  Accordingly, such contentions are meritless.

A vagueness challenge "may be overcome in any specific case where reasonable persons would know that their conduct is at risk." Maynard v. Cartwright, 486 U.S. 356, 361 (1988); see also Mannix, 619 F.3d at 197 ("The touchstone of the notice prong is whether the statute . . . made it reasonably clear at the relevant time that the defendant's conduct was criminal.") (citations omitted).  Thus, the question becomes whether the conduct is such which an ordinary person would know is criminal or proscribed.  Mannix, 619 F.3d at 198 (citations omitted).  Giving birth and then leaving a new born child unattended in a toilet after seeing it move and then placing it into a garbage bag and sealing it would be criminal conduct of which an ordinary person would be on notice.

Moreover, the test as applied at the time of Strawbridge's indictment and conviction pursuant to Register was not arbitrarily enforced because it "was defined as distinct from, and requiring an element in addition to, the lesser included offense of reckless manslaughter."  Mannix, 619 F.3d at 199 (citations omitted).  The presence of these distinctions precludes the argument that depraved indifference could have been conflated with the requirements of either intentional murder or reckless manslaughter.  Moreover, as discussed above, vagueness challenges grounded upon due process do not give rise to constitutional violations "when two statutes proscribe the same conduct and a defendant is charged under the one subjecting him to greater punishment."  Id. at 200 (citations omitted).

Accordingly, Strawbridge's claims that the depraved indifference statute was constitutionally vague should be denied on the merits.

32

## C. Sufficiency of the Evidence

Strawbridge claims that the evidence produced at her trial was insufficient to prove three distinct elements required for a finding of guilt.  The Appellate Division has already decided this issue on the merits, requiring deference unless it represents an unreasonable application of the law or its application.

In seeking habeas corpus review, a petitioner who claims that the evidence was insufficient to sustain a conviction bears a "very heavy burden." Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 811 (2d Cir. 2000).  "[T]he critical inquiry on the review of the sufficiency of the evidence . . . [is] whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 318 (1979).  The reviewing court must determine if, "after viewing the evidence in light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Id. at 319 (emphasis in original).  The reviewing court defers to the jury's determination as to the weight of the evidence and the credibility of the witnesses. United States v. Velasquez, 271 F.3d 364, 370 (2d. Cir 2001).

In considering the sufficiency of the evidence on a state conviction, the federal court must first examine state law to determine the elements of the crime.  Fama, 235 F.3d at 811.  Strawbridge was convicted of depraved indifference murder under N.Y. Penal Law § 125.25 (4).  Under that statute, a person is convicted "[u]nder circumstances evincing a depraved indifference to human life . . . the defendant recklessly engages in conduct which creates grave risk of serious physical injury or death to another person less than eleven years old and thereby causes the death of such person."  Id.  Strawbridge often

33

argues that given Dr. Singer's testimony, or the inconsistencies between all of the evidence, a reasonable person could not find guilt beyond a reasonable doubt.  Moreover, Strawbridge asserts that because mitigating circumstances were articulated by the Appellate Division, no rational trier of fact could find her both guilty of depraved indifference crime and suffering from factors which would engender empathy.  These arguments are not consistent with the deferential standard articulated in Jackson.  Under Supreme Court precedent, the Appellate Division receives deference for proper application of this standard if, viewing the facts all in the light most favorable to the prosecution, any reasonable person could have found Strawbridge guilty beyond a reasonable doubt.  This does not preclude a difference of opinion among rational minds or require that only one rational conclusion may be reached.

In this case, viewing the facts in the light most favorable to the prosecution, the evidence established that the baby was born alive, Strawbridge caused her death, and that Strawbridge acted under circumstances evincing a depraved indifference to human life.  Crediting the factfinder's credibility assessments of the prosecution's competent medical experts, their testimony about the uneven aeration in the lungs illustrating repeated attempts at breathing for a period of minutes to hours outside the presence of the mother and uterus support a finding of live birth.  Moreover, these experts discrediting Dr. Singer's conclusion that the cause of death was a rampant infection, given their conclusions that the baby was not under immense duress in utero, as well as their conclusion that there was not a septic infection also supports the notion of a live birth.  Additionally, Dr. Hogan's testimony that, given the baby's normal size and gestational age

she would probably not succumb to infection, as well as the fact that his review of the slides also confirmed an independent existence for minutes to hours also supports the contention that the baby was born alive.  With Strawbridge's repeated statements to multiple officers indicating the baby moved after delivery, and giving that evidence full credit in conjunction with the testimony of Drs. Wolf, Keough and Hogan, sufficient evidence existed to establish that a rational trier of fact could determine that the baby was born alive.

The same is true when evaluating whether the evidence, viewed in the light most favorable to the prosecution, established that Strawbridge was the cause of her daughter's death.  In order "[f]or criminal liability to attach, a defendant's actions must have been an actual contributory cause of death . . . forg[ing] a link in the chain of causes which actually brought about the death."  Matter of Anthony M., 63 N.Y.2d 270, 280 (1984) (citations omitted).  This does not mean that Strawbridge's actions were "the sole cause of death . . . [as] other causes, such as a victim's preexisting condition, will not relieve the defendant of responsibility for homicide."  Id. (citations omitted).  Viewing the evidence in the light most favorable to the prosecution, by accepting the fact that the baby was born alive, Strawbridge's subsequent actions were the clear link contributing to the baby's asphyxia.  Whether it is because Strawbridge temporarily abandoned the moving infant in the toilet bowl full of water, or placed her into two plastic bags which she knotted closed, both actions supply the chain of events leading to the absence and termination of oxygen causing asphyxia, the prosecution's proffered cause of death.

Finally, viewing the evidence in the light most favorable to the prosecution, it is clear

that Strawbridge acted under circumstances evincing depraved indifference to human life.

Strawbridge argues that based on medical evidence, which was not submitted at trial but

only in the sentencing memoranda, that she was incapable of acting with depraved

indifference because she did not have the capacity to understand the circumstances

surrounding her.  Because this evidence was not proffered during trial, its consideration

now is barred.  Moreover, again crediting the evidence in the light most favorable to the

prosecution, the mental health examination indicating that Strawbridge understood her

pregnancy but did not like the information that she was hearing, in conjunction with the

letter she authored to Reilly indicating her disdain for the child and intention to dispose of it

supports the conclusion that Strawbridge possessed the ability to understand.

   Moreover, the Appellate Division properly applied the Jackson standard, viewing the

evidence in the light most favorable to the prosecution and identifying various pieces of

evidence to support rationally each element of the conviction.[11]  While the court

recognized the fact that both sides produced competent and divergent medical evidence,

this does not mean that the court failed to make its determination based on the

appropriate standard.  In fact, the court reiterated that it must grant the factfinder

---

   [11] Strawbridge also contends that the Appellate Division incorrectly conflated the
elements of the depraved indifference murder test.  Reading the decision, it is apparent
that this contention is untrue.  The court identified the appropriate criminal statute and
elements and then further described the various portions of the crime.  Specifically, the
court cited Register and outlined the prosecution's burden, proving that (1) the defendant
created a grave risk under circumstances evincing depraved indifference, (2) evaluation of
those circumstances refers to the risk creating conduct and an objective assessment of
the degree of risk created, and (3) the distinction between the recklessness required for
manslaughter versus depraved indifference.  Strawbridge I, 299 A.D.2d 584 at 613-14.
Accordingly, Strawbridge's arguments must be rejected.

deference in regards to his credibility assessments and that, given that deference and viewing the evidence in the light most favorable to the prosecution, a rational factfinder could find Strawbridge guilty beyond a reasonable doubt because "she acted with extreme recklessness . . . that, viewed objectively, . . . manifested a depraved indifference to the life of her newborn baby." Strawbridge I.

This evidence was found sufficient by the Appellate Division, which explicitly held that Strawbridge's baby was born alive, her actions caused its death and these actions evidenced a depraved indifference to life.  For the reasons stated above, these factual determinations require deference and a presumption of correctness as they have not been proven to be a contrary or unreasonable application of federal law.  Therefore, the amended petition on this ground should be denied.


## D.  Suppression of Statements

Strawbridge contends that her statements to law enforcement should all have been suppressed because they were the result of custodial interrogation and coercion and later statements were not remedied by the untimely advice of rights.  In Strawbridge I, the Appellate Division affirmed the holdings from the suppression hearing, representing a decision on the merits which, as previously discussed, is granted deference unless it represents an unreasonable application of settled Supreme Court law.

Confessions "obtained by techniques and methods offensive to due process' or under circumstances in which the suspect clearly has no opportunity to exercise a free and unconstrained will . . . are inadmissible under the Fifth Amendment."  Tankleff w.

Senkowski, 135 F.3d 235, 242 (2d Cir. 1998) (citing Oregon v. Elstad, 470 U.S. 289, 304 (1963)) (internal quotation marks and citations omitted).  The prophylactic advice of constitutional rights recognizes "the Fifth Amendment and sweep[] more broadly than the Fifth Amendment itself . . . be[ing] triggered even in the absence of a Fifth Amendment violation."  Id. at 305-06.  "Failure to administer . . . warnings creates a presumption of complusion.  Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence . . . ."  Id. at 306-07.  "A suspect is entitled to . . . warnings only if he or she is interrogated while 'in custody.'"  Tankleff, 135 F.3d at 242-43 (citations omitted).  The question of custody is a mixed one based in fact, what the circumstances surrounding the interrogation amounted to, and law, whether an individual would feel comfortable leaving in those circumstances.  Id. at 243.  This inquiry, like the others, is premised on the totality of the circumstances and the voluntariness of the individual's actions.  Id. at 243-44.

Accordingly, as found by the Appellate Division, Strawbridge's statements to Ruede and Lockart when they first arrived at CHP were non-custodial and voluntary. When the Appellate Division evaluated whether the discussions between Strawbridge, Ruede and Lockart at CHP were voluntary, they expressly considered the circumstances surrounding the questioning to determine that such conversations were investigatory and not accusatory in nature.  The interview was conducted at Strawbridge's place of employment, not a police station, and concerned general questions about the health and welfare of the Strawbridge baby.  Investigator Ruede and Lockart were in civilian clothes and an unmarked car and had a calm and civilized conversation with Strawbridge.  All of these

things, as the Appellate Court noted, represent circumstances under which Strawbridge's

initial inculpatory statements were freely and voluntarily given.  Thus, to the extent these

statements were permitted at trial, the Appellate Division's decision should be granted

deference and upheld as they did not represent an unreasonable application of Supreme

Court precedent or a misapplication of the facts.  However, once Strawbridge made

inculpatory statements to Lockart about giving birth to and disposing of her baby, a

reasonable person under those circumstances would not feel that they were able to leave

and any additional statements made had an element of inherent coercion.  As the

Appellate Division made these identical findings, it cannot be said that its decision

incorrectly applied facts or Supreme Court precedent.

Moreover, merely because the statements made immediately after those inculpatory

admissions were suppressed does not mean that Strawbridge's written statement

produced after advice of rights must be suppressed.  See Vachet v. West, No. 04-CV-

3515, 2005 WL 740640, at *5 (E.D.N.Y. March 24, 2005) ("Under federal law, pre-Miranda

custodial interrogations does not necessarily require that subsequent, post-Miranda

statements be suppressed.") (citing Oregon v. Elstad, 470 U.S. 298, 314 (1985) ("A

subsequent administration of Miranda warnings to a suspect who has given a voluntary

but unwarned statement ordinarily should suffice to remove the conditions that precluded

admission of the earlier statement.")).  On habeas review the issue is not the application of

New York law but rather whether the subsequent statements were involuntary in

contravention of Elstad or whether the government limitation on statements presented in

Missouri v. Seibert, 124 S. Ct. 2601 (2004) is present.  Id., 2005 WL 740640, at *5.

"The test of a confession's voluntariness is whether an examination of all the circumstances demonstrates that the conduct of law enforcement officers was such as to overbear the defendant's will to resist and bring about confessions not freely self-determined." Delesline v. Conway, 755 F. Supp. 2d 487, 501 (S.D.N.Y. 2010) (citing Rogers v. Richmond, 365 U.S. 534, 544 (1961)).  In evaluating the voluntariness of a confession, the court must look at the totality of the circumstances.  Arizona v. Fulminante, 499 U.S. 279, 286-87 (1991).  Such circumstantial factors include the defendant's background and experience, the environment of the interrogation and the conduct of the law enforcement officers.  United States v. Ruggles, 70 F.3d 262, 265 (2d Cir. 1995).

The written statement elicited at the Troopers barracks was  voluntary in nature.  As the Appellate Court discussed, Strawbridge was not compelled to go with the Colonie officer, who Strawbridge knew did not have jurisdiction over the matter, in an unmarked car, without restraints, to answer questions.  Strawbridge's actions in agreeing to accompany Ruede and Lockart back to the Trooper's barracks were not coercive as evidenced by the circumstances surrounding the events.  Accordingly, federal review is inappropriate.

The time period which has elapsed between the initial statement, the Miranda warning, and the subsequent statement must be examined "to determine whether the two instances are viewed "as a distinct experience . . . and thus the Miranda warnings . . . present[ed] a genuine choice whether to follow up on the earlier admission [and continue talking]." Missouri v. Seibert, 542 U.S. 600, 602 (2004).  This exemption again evaluates the voluntariness of the statement and whether the Miranda warning was actually

meaningful.  While the Appellate Division utilized a different test in determining whether there was a sufficient break in the chronology to allow Strawbridge a reasonable choice whether to speak directly with the authorities, that court applied the Supreme Court precedent in a modified form.

Here, the fact that after making inculpatory statements she was permitted to return, unescorted and unrestrained, to her office and then later returned and voluntarily agreed to go to the State Police station for questioning after she learned that Ruede lacked jurisdiction over the present situation constituted a pronounced break between the two conversations.  Moreover, unlike Seibert, Strawbridge was questioned in a different place, quite some time after her initial conversations at CHP, by officers who were not "systematic, exhaustive, [or managing her] with psychological skill."  Seibert, 542 U.S. at 602.  The officers were noted to be polite, courteous, and non-accusatory.  "[A] substantial break in time and circumstances between the prewarning statement and the warning may suffice in most instances . . . .," Seibert, 542 U.S. at 603.  This mirrors the Appellate Division's holding that "there was a definite, pronounced break in interrogation such that the defendant may be said to have returned . . . to the status of one who is not under the influence of questioning.  Strawbridge I, 299 A.D.2d at 589.  Thus, the Appellate Division's decision represents a proper application of Supreme Court precedent.  Accordingly, the Appellate Division's holding is granted deference as Strawbridge's statements at CHP and the Trooper barracks were both plainly voluntary.

Accordingly, the amended petition on this ground should be denied.

41

**V.  Conclusion**

For the reasons stated above, it is **RECOMMENDED** that the amended petition for a writ of habeas corpus (Dkt. No. 61) be **DENIED**.

Furthermore, the Court finds that petitioner has not made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2) ("A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."); see also Lucidore v. New York State Div. of Parole, 209 F.3d 107, 112 (2d. Cir. 2000).  Therefore, the Court recommends that no certificate of appealability should issue with respect to any of petitioner's claims.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.   Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan, 984 F.2d at 89 (citing Small v. Secretary of Health and Human Services, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

**IT IS SO ORDERED.**

Dated: November 23, 2011
      Albany, New York

_David R. Homer_
United States Magistrate Judge

42